**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID STIEGLITZ, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-76 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION AND ORDER**

David Stieglitz, a white firefighter, worked as the driver of a firetruck at a specific firehouse for several months. Steven Clay, a black captain of the truck, hired two black drivers to share driving duties. That decision did not go over well with Stieglitz. Drivers receive a mandatory bonus, so a loss of driving opportunities means a loss of money.

Stieglitz complained to the City of Chicago and the Chicago Fire Department about the new drivers. He pointed fingers at the new drivers because they did not have the necessary certifications. That complaint came back to bite him. As things turned out, he didn't have the certifications, either.

The fire department suspended him from driving (with pay) for a few weeks to investigate. They investigated the two black drivers, too. In the end, the fire department concluded that Stieglitz was grandfathered in, so it reinstated him and found no wrongdoing.

Stieglitz later sued the City of Chicago. He claims that the fire department engaged in reverse race discrimination by hiring the two black drivers and by suspending him. He also claims that the City retaliated against him. The City now moves for summary judgment, arguing that Stieglitz hasn't met his burden for either claim.

For the reasons stated below, the City's motion for summary judgment is granted.

**Background**

The Chicago Fire Department runs about 100 firehouses. *See* Pl.'s Resp. to Def.'s Rule 56.1 Statement ("Pl.'s 56.1 Resp."), at ¶ 4 (Dckt. No. 88-1). This case involves the Chicago Avenue Firehouse, which is about two miles west of the Water Tower in downtown Chicago.

Each firehouse is staffed 24 hours a day, with staff members assigned to one of three shifts. *Id.* at ¶ 11. Firefighters operate different types of vehicles, including a truck (with a hook and ladder), an engine (with hoses), and a tower ladder (with a basket). *Id.* at ¶ 7.

From a financial perspective, there is an upside for firefighters to drive the firetrucks. Drivers receive extra pay, called "driver differential" compensation, for getting behind the wheel. *Id.* at ¶ 8; *see also* Chicago Fire Fighters Union Local No. 2 Labor Contract, at 138–39 (Dckt. No. 77-7). It pays to drive.

To drive a vehicle, firefighters must have proper licensing, training, and certifications, including a Department Vehicle Operator ("DVO") certification for the specific vehicle they will drive. *See* Pl.'s 56.1 Resp., at ¶ 35 (Dckt. No. 88-1); Def.'s Resp. to Pl.'s Rule 56.1 Statement ("Def.'s 56.1 Resp."), at ¶ 11 (Dckt. No. 90). So, there is a DVO for a truck, another DVO for an engine, and a DVO for a tower ladder.

On August 28, 2015, the Chicago Fire Department issued General Order 15-006, which established the requirements for obtaining a DVO certification, effective September 1, 2015. *See* CFD General Order 15-006, at 1, 3 (Dckt. No. 77-5). One of the procedures expressly covered DVO certifications for vehicles other than automobiles. "Members who seek Department Vehicle Operator Certification for any Vehicle Type other than a Standard Automobile must possess a valid State of Illinois license or permit for that Vehicle Type **and**

2

successfully complete a FSVO course, combined with supervised and documented Vehicle Operator Training, prior to receiving Department Vehicle Operator Certification for that Vehicle Type." *Id.* at § IV.C. (emphasis in original); *see also* Def.'s 56.1 Resp., at ¶ 18 (Dckt. No. 90).

For present purposes, the key point is that the fire department required a Fire Service Vehicle Operator ("FSVO") certification (and that requirement was apparently new). To obtain a Department Vehicle Operator certification, a driver needed to successfully obtain a Fire Service Vehicle Operator certification through an FSVO course. *See* CFD General Order 15-006, at 3 (Dckt. No. 77-5); Pl.'s 56.1 Resp., at ¶¶ 33–35 (Dckt. No. 88-1).

The Chicago Avenue Firehouse operates Truck 19. *See* Pl.'s 56.1 Resp., at ¶ 10 (Dckt. No. 88-1). During the relevant time period, Captain Steven Clay led Truck 19's third shift. *Id.* at ¶ 12. But in 2016, Truck 19's third shift had no assigned driver. *See* Def.'s 56.1 Resp., at ¶ 2 (Dckt. No. 90).

On June 1, 2016, Stieglitz came on board as the driver of Truck 19. *Id.* at ¶ 7; Pl.'s 56.1 Resp., at ¶ 5 (Dckt. No. 88-1). The parties disagree about who reached out to whom, and how Stieglitz got there, but it makes no difference.

When he arrived, Stieglitz already had a certification to drive a firetruck – he received that certification in 2008. But he didn't have an FSVO certification. *See* Pl.'s 56.1 Resp., at ¶ 38 (Dckt. No. 88-1). He didn't think that he needed it. The fire department put in place the requirement for an FSVO in September 2015, and by that point, Stieglitz had driven a firetruck for years. He believed that firefighters who had obtained a DVO before General Order 15-006's effective date were grandfathered in, even if they did not have an FSVO certification. *Id.* at ¶ 35; *see also* Stieglitz Aff., at ¶ 33 (Dckt. No. 88-4).

For a few months, Stieglitz drove Truck 19, and was the only driver on the third shift. *See* Def.'s 56.1 Resp., at ¶ 7 (Dckt. No. 90); *see also* Clay Dep., at 139:13-24 (Dckt. No. 77-6).[1] He was the regular driver, meaning that he drove the truck every day. *See* Def.'s 56.1 Resp., at ¶ 7.

Things changed in October 2016. Capt. Clay hired two black firefighters, Bryan Sledge and Roy Linzy-Turner, to drive Truck 19. *See* Pl.'s 56.1 Resp., at ¶¶ 20–21, 25 (Dckt. No. 88-1). All of a sudden, Stieglitz went from *the* driver to *one* of the drivers.

Stieglitz apparently viewed the arrival of Sledge and Linzy-Turner as an invasion of his territory. When he offered Stieglitz the position in May 2016, Capt. Clay said that he would be the regular driver of Truck 19, and that it was a permanent position. *See* Def.'s 56.1 Resp., at ¶¶ 5–6 (Dckt. No. 90). Stieglitz seemingly understood those statements to mean that he would be the *only* driver. *See* Stieglitz Aff., at ¶ 13 (Dckt. No. 88-4); Stieglitz Dep., at 32:23 – 34:7 (Dckt. No. 77-2).

They started sharing the wheel. In the months after Sledge and Linzy-Turner arrived, the fire department assigned driving duties to the three of them equally, more or less. Between October 1, 2016 and September 30, 2017, Stieglitz drove the truck 41 times, Linzy-Turner drove 41 times, and Sledge drove 25 times. *See* Truck 19 Telestaff Report, at 51–52 of 60 (Dckt. No. 77-10); Def.'s Statement of Facts, at ¶ 26 (Dckt. No. 77); Pl.'s 56.1 Resp., at ¶ 26 (Dckt. No. 88-1) (providing no admissible evidence to dispute the City's claim that Stieglitz drove 41 times).[2]

---

[1] The City admits that Stieglitz was *a* driver for the first few months, but denies that he was *the* driver. *See* Def.'s 56.1 Resp., at ¶ 7 (Dckt. No. 90). The City cites page 67 of the Clay deposition transcript, but that passage says that "it was understood that he would – he would be the driver." *See* Clay Dep., at 67:15-16 (Dckt. No. 77-6).

[2] In his statement of additional facts, Stieglitz contends that he drove the truck approximately 20 times – not 41 times – from October 2, 2016 to September 30, 2017. *See* Pl.'s Additional Facts, at ¶ 45 (Dckt.

So one driver (Sledge) drove as often as Stieglitz, and the other driver (Linzy-Turner) drove less. But Stieglitz was driving only 38% of the time (41 of 107 is 38%). And before they arrived, Stieglitz was doing all of the driving (and receiving all of the bonuses).

The parties disagree about how the fire department decided who would do the driving. The City presented evidence that there was no regular driver, and that Sledge and Linzy-Turner were in a rotation with Stieglitz. *See* Def.'s Statement of Facts, at ¶ 25 (Dckt. No. 77). Stieglitz responded that rotating drivers is not an accepted practice of the Chicago Fire Department. *See* Pl.'s 56.1 Resp., at ¶ 25 (Dckt. No. 88-1). The parties argue, but again, it makes no difference.

At some point, someone got wind that Sledge and Linzy-Turner did not have all of the certifications. (The record does not include the backstory about how this fact came out.) Both of them had obtained an FSVO certification (again, showing the completion of the Fire Service Vehicle Operator course). They also had DVO certifications (again Department Vehicle Operator), but not for the right vehicle. They had DVO certifications for a *tower ladder*, but not for a *truck*. *Id.* at ¶¶ 39–40.

The parties offer conflicting evidence about whether Capt. Clay knew that the two black drivers lacked the certifications. Capt. Clay testified that he wasn't aware of the certification status of any of his three drivers. *Id.* at ¶ 44. But Stieglitz presented evidence that he told Capt. Clay on more than one occasion – before they started at the Chicago Avenue Firehouse – that Sledge and Linzy-Turner were not certified. *See* Def.'s 56.1 Resp., at ¶ 32 (Dckt. No. 90); Stieglitz Aff., at ¶¶ 16–17 (Dckt. No. 88-4).

---

No. 88-2). But as the City pointed out in its response, Stieglitz relies on a document that covers a different time range. He cites a document that covers June to August 2016, not October 2016 to September 2017. *See* Def.'s 56.1 Resp., at ¶ 45 (Dckt. No. 90). In any event, the precise number is not critical. The key point is that Stieglitz was doing much of the driving, but not all of the driving (or even most of the driving).

When the firehouse's Battalion Chief, Margaret Kane, discovered that the new drivers did not have a DVO for a truck, she instructed them to begin the certification process. *See* Pl.'s 56.1 Resp., at ¶ 41 (Dckt. No. 88-1). Sledge and Linzy-Turner eventually received their DVO certifications for a truck in February 2017. *Id.* at ¶¶ 39–40, 48.

Meanwhile, Stieglitz, Sledge, and Linzy-Turner continued to drive the truck. According to evidence from the City, in January and February 2017, Stieglitz drove the truck six times, and Sledge and Linzy-Turner drove four times (each). *Id.* at ¶ 26. Stieglitz suggests that he did not drive the truck at all during those months,[3] but the more important point seems to be that he wasn't the *only* driver of Truck 19. Sledge and Linzy-Turner had their hands on the wheel, too.

On January 30, 2017, Stieglitz contacted the City of Chicago Office of the Inspector General ("OIG") and made a complaint. He complained that Sledge and Linzy-Turner were driving Truck 19 without proper certifications. *Id.* at ¶ 45.

That complaint opened a can of worms. Stieglitz's complaint started a process that culminated in his own suspension.

OIG passed along his complaint to the fire department's Internal Affairs Division ("IAD"). *Id.* at ¶ 47. In March 2017, IAD investigator Nicholas Ranucci interviewed Stieglitz. *Id.* at ¶ 48. Stieglitz complained that Capt. Clay favored Sledge and Linzy-Turner based on their friendship. He also complained that they weren't certified. Along the way, Stieglitz divulged that he didn't have an FSVO certification, but he believed that he was grandfathered in. *Id.*

---

[3] Stieglitz attempted to introduce evidence that he did not drive at all in the months of January or February 2017. *See* Stieglitz Aff., at ¶ 31 (Dckt. No. 88-4); Exhibit C (Dckt. No. 88-3, at 13 of 13); *see also* Plaintiff's Mem. in Opposition to Def.'s Mtn. for Summ. J. ("Stieglitz Mem."), at 8 (Dckt. No. 88) ("In fact, Stieglitz's Telestaff report shows that in January and February, 2017, he did not drive Truck 19."). But as explained later in the opinion, he relied on a document that he did not produce in discovery, so it is out of the case. *See* Fed. R. Civ. P. 37(c)(1).

The parties disagree about whether Stieglitz complained about anything else. According to the City, Stieglitz did not raise any other issues, and the City points to the case files and Ranucci's declaration for support. *Id.* at ¶¶ 45, 49; *see also* OIG Case File (Dckt. No. 77-11); IAD Report SC #17-0044 (Dckt. No. 77-12); Ranucci Dec., at ¶ 7 (Dckt. No. 77-13) ("Stieglitz did not state that he believed Captain Clay's actions were based on race."). But Stieglitz – the only white firefighter of the group – submitted an affidavit saying that he raised the issue of race discrimination. *See* Stieglitz Aff., at ¶¶ 39–46 (Dckt. No. 88-4); Pl.'s 56.1 Resp., at ¶ 49 (Dckt. No. 88-1); *see also* Def.'s 56.1 Resp., at ¶ 8 (Dckt. No. 90).

Meanwhile, Ranucci (again, the investigator) started probing into whether firefighters were driving vehicles without proper certifications. He opened files for Sledge and Linzy-Turner, but he also opened a file about Stieglitz, too. All told, he opened files for 35 individuals, including all the supervisors who allowed them to drive Truck 19. *See* IAD File, at 1–2 of 31 (Dckt. No. 77-12); Ranucci Dec., at ¶ 10 (Dckt. No. 77-13).

A suspension followed. On May 31 or June 1, Capt. Clay called Stieglitz and left him a message, letting him know that he could no longer drive any firetrucks. *See* Def.'s 56.1 Resp., at ¶ 59 (Dckt. No. 90); Pl.'s 56.1 Resp., at ¶ 54 (Dckt. No. 88-1). On June 2, Battalion Chief Kane showed Stieglitz a letter on his computer screen. The letter confirmed that Stieglitz was suspended from driving until he received the proper certifications.[4] *See* Def.'s 56.1 Resp., at ¶ 60. Stieglitz responded that he already had the proper certifications. *Id.*

It appears that the parties agree on the dates of the suspension (but maybe not when his vacation started). Stieglitz testified that he received a phone message from Capt. Clay on June 1,

---

[4] The Court understands the facts to be that the fire department suspended Stieglitz from *driving*, but not from *working*. The key point, it seems, is that there is no evidence that the fire department reduced his pay (putting aside the issue of a bonus for driving).

2017 saying that he could no longer drive any firetrucks.  *See* Pl.'s Additional Facts, at ¶ 59 (Dckt. No. 88-2).  On June 2, 2017, Capt. Clay told Stieglitz (directly, it seems) that he was suspended from driving.  *Id.* at ¶ 61.  Stieglitz testified that he was detailed to Engine 42 on June 2, and was on furlough from June 3 to June 22, 2017.  *See* Pl.'s 56.1 Resp., at ¶ 58 (Dckt. No. 88-1).

The City contends that Stieglitz was "off duty or on furlough" from June 1 – not June 3 – to June 22, 2017, with the exception of the temporary detail on June 2.  *See* Def.'s Statement of Facts, at ¶ 58 (Dckt. No. 77).  The City admits that Capt. Clay called Stieglitz on May 31, 2017 "to inform him that he was suspended from driving."  *See* Def.'s Statement of Facts, at ¶ 54 (Dckt. No. 77).  According to the City, Stieglitz "went to work" on June 1, 2017,[5] and Capt. Clay told him that he was "taking Stieglitz off driving and that the decision had been made by the upper ranks."[6]  *Id.*

So, as the Court understands the undisputed facts, the City told Stieglitz that he could no longer drive firetrucks starting on June 1, 2017.  He was assigned to another station on June 2, 2017, but he didn't drive.  And he went on vacation starting on June 3 (at the latest).

Both parties agree that Stieglitz was technically suspended from driving at least as of June 1, 2017, and that he was on voluntary furlough (*i.e.*, vacation) from June 3 to June 22.  The suspension ended on June 22.  So, the suspension didn't pack much of a punch because he was on vacation anyway.

---

[5]  As an aside, it's not clear how the City could think that Stieglitz was on furlough starting on June 1, when the City also alleges that Capt. Clay had a conversation with Stieglitz at work on June 1.

[6]  The City admits that Stieglitz received a message from Capt. Clay on June 1, 2017 saying that he could no longer drive.  *See* Def.'s 56.1 Resp., at ¶ 59 (Dckt. No. 90).  But the City denies that Capt. Clay told Stieglitz on June 2, 2017 that he was suspended from driving.  *Id.* at ¶ 61.  The City apparently believes that the in-person conversation between Stieglitz and Capt. Clay took place on June 1, not June 2.

The parties do not explain all of the consequences of that suspension (if any). It appears that the fire department suspended Stieglitz from driving, but not from working. *Id.* at ¶¶ 60–61 (stating that Stieglitz "was suspended from driving until he received the proper certifications" and "suspended from driving any trucks"); Pl.'s 56.1 Resp., at ¶ 54 (Dckt. No. 88-1) ("On or about May 31, Captain Clay called Stieglitz to inform him that he was suspended from driving."). He just couldn't get behind the wheel. There is no evidence that Stieglitz lost any pay from the suspension (apart from a potential loss of driving bonuses).

Things turned around for Stieglitz a few weeks later. He returned to work on June 22, 2017, and met with Capt. Clay and Battalion Chief Kane. *See* Def.'s 56.1 Resp., at ¶ 62 (Dckt. No. 90);[7] Stieglitz Aff., at ¶ 62 (Dckt. No. 88-4). Capt. Clay let him know that he was free to resume driving Truck 19 again. *See* Def.'s 56.1 Resp., at ¶ 63; Stieglitz Aff., at ¶ 63. According to Stieglitz, Capt. Clay acknowledged that the fire department had "made a mistake." *See* Def.'s 56.1 Resp., at ¶ 63.

So Stieglitz got his hands on the keys once again. But things got off to a slow start. According to Stieglitz, he was not allowed to drive Truck 19 on June 23, 26, and 29. *Id.* at ¶ 64; Stieglitz Aff., at ¶ 65 (Dckt. No. 88-4).

On September 19, 2017, Stieglitz filed a charge of discrimination with the EEOC. *See* Second Am. Cplt., at ¶ 38 of Count I, ¶ 42 of Count II (Dckt. No. 21).[8] The EEOC issued a Dismissal and Notice of Rights letter the next month. *Id.* at ¶ 39 of Count I, ¶ 43 of Count II; *see*

---

[7] As the City points out, Stieglitz neglected to include any citations to the record to support these paragraphs. *See* Def.'s 56.1 Resp., at ¶¶ 62–63 (Dckt. No. 90). But it looks like an oversight. In neighboring paragraphs, Stieglitz cited to his affidavit, and it is easy to find support for the facts in that affidavit. It's not hard to find. The paragraph numbers are even the same – paragraph 62 of the affidavit supports paragraph 62 of the statement of additional facts.

[8] The complaint repeats the same numbers when numbering the paragraphs. The facts appear in paragraphs 1–36. Count I runs from paragraph 37–41. But instead of starting with paragraph 42, Count II reuses 37. So Count I has a paragraph 37, and so does Count II.

*also* Dismissal and Notice of Rights (Dckt. No. 21, at 12 of 12).  Stieglitz then timely filed this lawsuit, alleging reverse race discrimination and retaliation under Title VII.  *See* Cplt. (Dckt. No. 1).

Stieglitz later amended his complaint twice.  *See* Am. Cplt. (Dckt. No. 13); Second Am. Cplt. (Dckt. No. 21).  After discovery, the City moved for summary judgement on both counts.

## Legal Standard

A district court "shall grant" summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The substantive law controls which facts are material.  *Id.*  After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 250.

The Court "considers all of the evidence in the record in the light most favorable to the non-moving party, and draws all reasonable inferences from that evidence in favor of the party opposing summary judgment."  *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (cleaned up).  The Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in his favor."  *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (citations omitted).

**Discussion**

## I.  Reverse Race Discrimination

The City moved for summary judgment on Stieglitz's reverse race discrimination claim. "[T]he singular question that matters in a discrimination case[ is] '[w]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

Stieglitz alleges that the City took two adverse actions against him because he is white. First, Capt. Clay hired other drivers, which prevented him from driving Truck 19 every day. Second, the fire department suspended him after he complained to the Office of the Inspector General and the Internal Affairs Division.

Based on the record, no reasonable jury could find that the City discriminated against Stieglitz on the basis of race.

### A.  *McDonnell Douglas*

Both parties use the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  This Court will do the same.  *See Barnes v. Bd. of Trustees of Univ. of Illinois*, 946 F.3d 384, 389 (7th Cir. 2020).

Under that framework, a plaintiff must build a *prima facie* case that discrimination was the real reason behind the adverse employment action.  A *prima facie* case for reverse race discrimination requires a showing that "(1) background circumstances exist to show an inference that the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something fishy about the facts at hand; (2) he was meeting his employer's

11

legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated individuals who are not members of his protected class." *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016) (cleaned up).[9]

If the plaintiff makes that showing, then the burden shifts to the employer "to 'provide a legitimate, nondiscriminatory reason for the adverse employment decision.'" *Id.* (alteration omitted) (quoting *Balance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005)). If the employer meets its burden, then the burden flips back to the employee "to show the reasons given by [the defendant] are a pretext for discrimination." *Id.*

But "[b]ecause the *prima facie* and pretext inquiry often overlap, if a defendant offers a nondiscriminatory reason for its actions, [the Court] can proceed directly to the pretext inquiry." *Barnes*, 946 F.3d at 389; *see also Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009) ("The prima facie case and pretext analyses often overlap, so we have said that we can proceed directly to the pretext inquiry if the defendant offers a nondiscriminatory reason for its action.").

Here, the Court skips the four elements of a *prima facie* case and jumps right to the issue of pretext. The City offers a legitimate and nondiscriminatory reason for each of its decisions.

The City offered a nondiscriminatory reason for having multiple drivers. The City presented evidence that Capt. Clay wanted more individuals to become familiar with the truck and with the neighborhood. *See* Clay Dep., 159:18-20 (Dckt. No. 77-6). He believed a rotation made more efficient and productive firefighters. *See* Clay Dec., at ¶ 5 (Dckt. No. 77-4). Capt. Clay should know – he was part of a rotation himself when he was a firefighter. *See* Clay Dep.,

---

[9] It is not immediately clear to this Court whether Stieglitz suffered an adverse employment action. He was suspended, but it does not appear to have caused him any harm. He was on vacation anyway, and does not appear to have lost any money (or suffered any other work-related consequences). One possible exception is June 2, as discussed below. Overall, the City offers a legitimate, nondiscriminatory reason for the decisions, so the Court will focus on that issue.

at 148:20 – 149:2.  There is nothing facially outlandish about having more than one driver for a firetruck.  (Frankly, it seems like a good idea.)

The City gave a simple explanation for the temporary suspension, too.  Stieglitz told the investigator that he didn't have an FSVO certification.  *See* Pl.'s 56.1 Resp., at ¶ 48 (Dckt. No. 88-1).  This admission, in turn, led to an investigation into his ability to drive the truck, and the fire department took away the keys in the meantime.  *Id.* at ¶¶ 53–54.  The City has a legitimate need to make sure that firefighters have checked all of the boxes before getting behind the wheel of a life-saving vehicle.

The City has come forward with reasons for its decisions that are not race-based.  "By producing evidence (whether ultimately persuasive or not) of nondiscriminatory reasons," the City "sustained [its] burden of production" and rebutted the presumption of discrimination.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) (emphasis omitted); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) ("This burden is one of production, not persuasion; it 'can involve no credibility assessment.'") (citation omitted); *Rand v. C.F. Indus., Inc.*, 42 F.3d 1139, 1145 (7th Cir. 1994) ("CFI's mere production of this legitimate non-discriminatory reason for its action rebuts the presumption of discrimination created by the prima facie showing.").

The City offered a nondiscriminatory reason, so the burden shifts back to Stieglitz for evidence of pretext.  Bad decision-making does not count.  Pretext "is not 'just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action.'"  *Barnes*, 946 F.3d at 389–90 (cleaned up) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008)).

To show pretext, a plaintiff must come forward with evidence that "(a) the employer's nondiscriminatory reason was dishonest; and (b) the employer's true reason was based on a discriminatory intent." *Perez v. Illinois*, 488 F.3d 773, 777 (7th Cir. 2007) (quotation marks omitted) (quoting *EEOC v. Target Corp.*, 460 F.3d 946, 960 (7th Cir. 2006)). "[A] plaintiff would not succeed on her discrimination claim if the employer 'honestly believed' its stated rationale for its adverse employment action, even if this honest belief was 'foolish, trivial, or baseless.' But, a plaintiff would win her case if she showed that 'the stated reason, even if actually present to the mind of the employer, wasn't what induced the employer to take the challenged employment action,' because that would constitute pretext." *de Lima Silva v. Dep't of Corrs.*, 917 F.3d 546, 561 (7th Cir. 2019) (cleaned up) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 853 (7th Cir. 2012)).

After surveying the record, the Court concludes that Stieglitz did not come forward with evidence of pretext.[10] Stieglitz presented no evidence that the City gave a phony reason for its decision to hire two other drivers, or its decision to suspend Stieglitz from driving during its investigation.

For the decision about multiple drivers, Stieglitz flatly rejects Capt. Clay's explanation that he hired them for efficiency purposes. Stieglitz believes that the fire department made that decision for race-based reasons. *See* Pl.'s Additional Facts, at ¶¶ 56–57 (Dckt. No. 88-2). His argument boils down to the following: Capt. Clay is black, and he allowed two black, non-certified drivers to take Stieglitz's job because Stieglitz was white.

---

[10] Stieglitz never actually offered any argument for pretext in his motion, focusing only on the *prima facie* case. *See* Stieglitz Mem., at 10–15 (Dckt. No. 88); *see also* Def. City of Chicago's Reply Mem. of Law in Further Support of its Mtn. for Summary Judgment ("City Reply"), at 11 (Dckt. No. 91) ("Plaintiff has offered no response to the City's pretext argument."). But the Court, placing Stieglitz's motion in its best light, will interpret his arguments as explanations of pretext.

14

But Stieglitz does not muster any evidence to support that theory. He comes forward with only his affidavit. *Id.*; *see also* Stieglitz Aff., at ¶¶ 46, 49 (Dckt. No. 88-4). An affidavit or declaration can suffice to create a genuine issue of material fact. But it depends on what it says.

An affidavit or declaration offered to support or oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *See* Fed. R. Civ. P. 56(c)(4). "Although 'personal knowledge' may include inferences and opinions, those inferences must be substantiated by specific facts." *Drake v. Minn. Min. & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998). "A party to a lawsuit cannot ward off summary judgment with an affidavit or deposition based on rumor or conjecture." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989). The non-moving party may not rest on "conclusory statements in affidavits." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020).

Stieglitz's declaration does not meet those requirements. The declaration offers a raw conclusion: Capt. Clay "allowed them to drive Truck 19 in order to discriminate against me on the basis of my race." *See* Stieglitz Aff., at ¶ 18 (Dckt. No. 88-4). That's it. He offers no support for the notion that Capt. Clay discriminated against him. There are no facts to back up the conclusion. Just *ipse dixit*.

A conclusory declaration does not move the evidentiary needle. A non-movant cannot carry the burden of proof by his or her say-so. A declaration that says, in effect, "I have a great case" does not create a genuine issue of material fact. The non-movant must "set out *facts*," not conclusions. *See* Fed. R. Civ. P. 56(c)(4) (emphasis added).

Stieglitz then proceeds down the rabbit hole of the collective bargaining agreement, and the City follows him underground. Stieglitz argues that he was a "regular driver," and that the

collective bargaining agreement does not allow the rotation of regular drivers. The parties tunnel down with the help of competing affidavits. *Compare* Stieglitz Aff., at ¶¶ 22, 24–25 (Dckt. No. 88-4) ("A driver rotation was not an accepted practice within the Chicago Fire Department. . . . The Collective Bargaining Agreement clearly indicates that there will be a primary regular driver for a truck. . . . The Company Officer, such as Clay, did not have discretion to decide whether to have any one regular driver or several in light of Section 16.10 of the Collective Bargaining Agreement."),[11] *with* Kane Aff., at ¶ 9 (Dckt. No. 77-8) ("Utilizing a driver rotation is an accepted practice within CFD, but it is ultimately the discretion of the Company Officer to decide.").

It makes no difference. Stieglitz's discrimination claim does not rise or fall depending on the meaning of the collective bargaining agreement. Suppose, for the sake of argument, that the decision by Capt. Clay violated the collective bargaining agreement. A failure to follow a labor agreement, without more, does not create an inference of racial animus.

Even if Stieglitz offered the better reading of that agreement, it would not be enough to establish pretext. Stieglitz "must 'identify such weaknesses, implausibilities, inconsistencies, or contradictions' in the [City's] asserted reason 'that a reasonable person could find [it] unworthy of credence.'" *Coleman*, 667 F.3d at 852 (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)). If the City "honestly believed the reasons it gave," then Stieglitz "loses even if the reasons were foolish, trivial, or baseless." *Boumehdi*, 489 F.3d at 792.

---

[11] Stieglitz offered an affidavit about General Order 15-006 and about the collective bargaining agreement from Patrick Cleary, a Battalion Chief for the Chicago Fire Department. *See* Cleary Aff. (Dckt. No. 88-5). The City, in turn, asks this Court to strike it because Stieglitz did not disclose Cleary as a witness during discovery. *See* City Reply, at 2–4 (Dckt. No. 91). This Court does not need to reach that issue because the decision does not turn on the meaning of the General Order or the collective bargaining agreement.

Maybe Stieglitz has a claim that Capt. Clay violated the collective bargaining agreement by rotating the drivers. The Court takes no stance on that issue. But without specific facts showing that race – not efficiency, driver comfort, or anything else – motivated the decision, Stieglitz cannot overcome the nondiscriminatory reason given by the City. And here, Stieglitz comes up short.

Stieglitz also presented evidence of mistreatment by Linzy-Turner and Sledge. For instance, Sledge and Linzy-Turner would allegedly bump into him for no reason and refused to let him in the firehouse's meal club. *See* Pl.'s Additional Facts, at ¶¶ 37–40 (Dckt. No. 88-2). But their conduct cannot give rise to a discrimination claim about sharing driving duties. Capt. Clay, not the other drivers, made the decision to rotate the drivers. *See* Pl.'s 56.1 Resp., at ¶ 25 (Dckt. No. 88-1). Maybe they mistreated Stieglitz, but there is no evidence linking that mistreatment to the loss of driving opportunities.

Stieglitz has not come forward with evidence that the suspension was pretextual, either. Stieglitz basically argues that no one cared about his lack of an FSVO certification until he contacted OIG and IAD. *See* Stieglitz Mem., at 13 (Dckt. No. 88). Again, he could be right, and for the sake of argument, the Court assumes he is.

But there is no evidence that the City gave a phony reason for the suspension. Stieglitz admits that he informed the investigator that he did not have an FSVO certification. *See* Pl.'s 56.1 Resp., at ¶ 48 (Dckt. 88-1). Stieglitz asks why the City waited over nine years since he began driving trucks to challenge his certification. The answer is obvious: he prompted the investigation.

The investigator did not act against Stieglitz alone. The investigator opened 35 files against Stieglitz, Sledge, Linzy-Turner, and all the supervisors that allowed them to drive Truck

17

19.  *See* IAD File, at 1–2 of 31 (Dckt. 77-12).  The Assistant Commissioner stated that he understood General Order 15-006 to require all drivers to have an FSVO certification.  *Id.* at 4 of 31.  The uncontested evidence shows that the City opened investigations against any drivers – black or white – who lacked the necessary certification.

It's true that the City did not suspend Sledge and Linzy-Turner.  But when the investigation opened, Sledge and Linzy-Turner had become fully certified.  (Recall that they obtained their DVO certifications in February 2017, and the investigation opened in the summer of 2017.)  Maybe they didn't have all of the necessary certifications on day one, but they did have all of the certifications when the investigation opened.  That's not the case for Stieglitz.

Maybe it was unwise for the City to suspend Stieglitz for lacking an FSVO certification.  But the Court has "authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair."  *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006).  Stieglitz has presented insufficient evidence for a reasonable jury to find that the suspension was rooted in racism.

Stieglitz has not demonstrated that the City gave pretextual reasons for the rotation of drivers or for his suspension.  Without showing pretext, Stieglitz has failed to hold up his end of the burden-shifting framework from *McDonnell Douglas*.

## B.    The Evidence as a Whole

The next step is to take a step back, and view the evidence as a whole.  *See Ortiz*, 834 F.3d at 766 ("We are [] concerned about the proposition that evidence must be sorted into different piles, labeled 'direct' and 'indirect,' that are evaluated differently.  Instead, all evidence belongs in a single pile and must be evaluated as a whole.  That conclusion is consistent with *McDonnell Douglas* and its successors.").

Before *Ortiz v. Werner Enterprises, Inc.*, courts in this District often distinguished between "direct" and "indirect" methods of analyzing discrimination claims. *See Ortiz*, 834 F.3d at 763–66. The *McDonnell Douglas* burden-shifting framework often fell under the "indirect" method. *Id.* at 766. Without disapproving of the *McDonnell Douglas* framework, *Ortiz* explained that courts must get back to basics. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Id.* at 765.

The Court must consider whether a reasonable jury could find that the actions against Stieglitz were discriminatory based on the evidence as a whole. The *McDonnell Douglas* framework is "merely one way of culling the relevant evidence" to adjudicate an employment discrimination claim. *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (quoting *Johnson*, 892 F.3d at 894). Even when analyzing a claim in the *McDonnell Douglas* framework, the Court must conduct a separate analysis to "assess cumulatively all the evidence presented by [the plaintiff] to determine whether it permits a reasonable factfinder to determine that [the adverse employment action] was attributable to her age, race, or sex." *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *see also McDaniel*, 940 F.3d at 368.

In the case at hand, after considering the evidence as a whole, the answer is the same. No reasonable jury could conclude that Stieglitz's race prompted the driving rotation or the suspension.

As discussed above, Stieglitz offers no evidence connecting his race to the decisions in question. He also does not come forward with evidence to undermine the City's legitimate, nondiscriminatory reasons for its actions.

19

Stieglitz points to the fact that Capt. Clay allowed Sledge and Linzy-Turner to drive even though they lacked certifications. He argues that he told Capt. Clay about Sledge and Linzy-Turner's certification status, but Capt. Clay still allowed them to drive before they became certified. *See* Def.'s 56.1 Resp., at ¶ 32 (Dckt. No. 90); Stieglitz Aff., at ¶¶ 16–17 (Dckt. No. 88-4). Stieglitz views that decision as evidence of race discrimination because Capt. Clay admitted that "it was his responsibility to know the requirements delineated in General Order 15-006" and "to make sure that whoever drove Truck 19 met the requirements of General Order 15-006 to drive that truck and that if he did not do that, he was not doing his job." *See* Stieglitz Mem., at 11 (Dckt. No. 88). In his view, allowing black drivers to get behind the wheel – even though they lacked certifications – is evidence of race discrimination.

In response, the City provided evidence that Capt. Clay did not know about *Stieglitz's* certification status. *See* Clay Dep., at 150:3-5 (Dckt. No. 77-6). Stieglitz disputes that fact, but his evidence is not on point. He offers evidence that Capt. Clay knew about Sledge's and Linzy-Turner's certifications. *See* Pl.'s 56.1 Resp., at ¶ 44 (Dckt. No. 88-1). But Stieglitz does not offer evidence about whether Capt. Clay knew or checked whether Stieglitz lacked an FSVO certification. If anything, the evidence shows that Capt. Clay took a lax approach to this issue across the board, for both white and black drivers.

The bottom line is that there is no evidence that Capt. Clay took a more lenient approach toward black drivers than he did toward Stieglitz. It is true that the fire department suspended Stieglitz from driving, but did not suspend Sledge and Linzy-Turner. But there is a simple explanation: at that point, Stieglitz did not have the all of the certifications, but Sledge and Linzy-Turner did.

And even then, there is no evidence that Capt. Clay treated the black drivers better. The City provides evidence that Stieglitz drove just as often as them, if not more. *See* Truck 19 Telestaff Report (Dckt. No. 77-10). So even if Capt. Clay was misguided in letting uncertified drivers drive, there is no evidence that race discrimination came into play.

Stieglitz submitted an image of what he claims to be his time report from January and February 2017, arguing that he did not drive at all during those months. *See* Exhibit C (Dckt. No. 88-3, at 13 of 13); Stieglitz Mem., at 8 (Dckt. No. 88). But the image was not disclosed during discovery. *See* City Reply, at 4 (Dckt. No. 91). A party must disclose "a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." *See* Fed. R. Civ. P. 26(a)(1)(A)(ii). A failure to disclose a document means that it is out of the case, unless the party comes forward with a good reason for its late appearance. *See* Fed. R. Civ. P. 37(c)(1).

Stieglitz argues that the exhibit should "not be stricken since Stieglitz submitted his Telestaff report to rebut the one produced by the City because the City's Telestaff report contained inaccurate information." *See* Pl.'s Mem. in Opposition to Def.'s Mtn. to Strike the Cleary Aff. and to Disregard Certain Portions of the Stieglitz Aff., at 2 (Dckt. No. 92). That response does not explain the failure to produce it in discovery. So the exhibit counts for nothing. *See Barnett v. Menard, Inc.*, 851 F. App'x 619, 623 (7th Cir. 2021) ("[Menards] has provided no reason for failing to produce the policy other than, apparently, believing it was under no obligation to do so. And given the policy's centrality to whether Menards had reasonable safety practices in place at the time of Barnett's accident, we cannot say that the omission was harmless.").

There are other problems too.  It is not enough to show that Stieglitz did not drive in January or February 2017.  He would need to offer evidence that he did not drive during those months for race-based reasons.  And here, the evidentiary cupboard is bare.

Stieglitz's position is inconsistent with his deposition testimony, too.  During his deposition, Stieglitz testified that he did not recall whether he drove Truck 19 in January or February 2017.  *See* Stieglitz Dep., at 81:14 – 82:19 (Dckt. No. 88-6).  As such, there's no genuine dispute over his work schedule compared to Sledge and Linzy-Turner.  *See Ineichen v. Ameritech*, 410 F.3d 956, 964 (7th Cir. 2005) (holding that "later-filed contradictory affidavits" cannot create "'sham' issues of fact with affidavits that contradict their prior depositions") (quoting *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996)).

Viewed as a whole, the evidence about sharing driving duties could not support a verdict by a reasonable jury that the City engaged in racial discrimination.  Maybe Capt. Clay made bad decisions, or violated the collective bargaining agreement.  But even when viewed in a light favorable to Stieglitz, the evidence does not create an inference of reverse race discrimination.  "At issue here is whether [Stieglitz] has presented sufficient evidence that *race* motivated" the City's decisions.  *Henry v. James*, 507 F.3d 558, 567 (7th Cir. 2007) (emphasis in original).

On the issue of the suspension, Stieglitz offers even less proof.  The City gave a reasonable explanation for its decision – Stieglitz wasn't certified.  Stieglitz admitted that he reported this fact to the investigator.  He presented no evidence that his supervisors already knew about his lack of certification.  The fire department suspended him when they found out about the missing certification.

Stieglitz has not come forward with evidence that could support a verdict by a reasonable jury that the City acted based on race. Therefore, the Court grants the City's motion for summary judgment for Count I.

## II.   Retaliation

The City also moved for summary judgment on Stieglitz's retaliation claim.

For a retaliation claim, a plaintiff can proceed "under either the direct or indirect method." *Lewis v. City of Chicago*, 496 F.3d 645 (7th Cir. 2007) (quoting *Roney v. Illinois Dep't of Transp.*, 474 F.3d 455, 459 (7th Cir. 2007)). "Under the direct approach, the employee must show evidence that he engaged in a statutorily protected activity (such as bringing a Title VII claim) and as a result, suffered an adverse action. Alternatively, the employee may proceed under the indirect approach and show that after he complained of discrimination, he, and not any other similarly situated employee who did not complain, was subject to an adverse action although he was performing up to the employer's legitimate job expectations." *Roney*, 474 F.3d at 459 (citation omitted).

Stieglitz proceeds under the direct method. Under the direct method, Stieglitz must prove that (1) he engaged in statutorily protected activity; (2) the City took a materially adverse action against him; and (3) the protected activity and the adverse action are causally connected. *See Robinson v. Perales*, 894 F.3d 818, 830 (7th Cir. 2018) (citation omitted); *see also Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016).

Based on the record, no reasonable jury could conclude that the City retaliated against him.

### A.      Statutorily Protected Activity

The first question is whether Stieglitz came forward with evidence that he had engaged in a protected activity.

"[F]iling an official complaint with an employer may constitute statutorily protected activity under Title VII," but "the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 664 (7th Cir. 2006).  That is, "'[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient' to establish that [an employer] engaged in a protected activity." *Miller v. Chicago Transit Auth.*, 2020 WL 5547877, at *5 (N.D. Ill. 2020) (quoting *Tomanovich*, 457 F.3d at 663); *see also Cole v. Bd. of Trustees of N. Illinois Univ.* 838 F.3d 888, 901 (7th Cir. 2016) (holding that a statutorily protected activity "requires more than simply a complaint about some situation at work, no matter how valid the complaint might be").

According to the City, Stieglitz never complained about race.  *See* Def.'s Mem. in Support of Summ. J. ("City Mem."), at 17 (Dckt. No. 76).  The City relies on the OIG complaint and a record of the IAD interview.  *Id.*  The City correctly points out that neither document mentions race.  *See* OIG Case File (Dckt. No. 77-11); IAD Report (Dckt. No. 77-12).

But Stieglitz offered evidence of his own, in the form of his personal testimony.  In his affidavit, Stieglitz stated that he alleged race discrimination to both the OIG and IAD.  *See* Stieglitz Aff., at ¶¶ 39–46 (Dckt. No. 88-4).  That is, he testified that he told the investigators that Capt. Clay treated him differently based on his race.

24

For now, that evidence is sufficient. Testimony is evidence, even without documentary backup. Stieglitz offered evidence that he complained about race discrimination. That complaint qualifies as a protected activity.

### B.    Adverse Employment Action

The second question is whether Stieglitz suffered an adverse employment action.

To satisfy that requirement, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (cleaned up). "An act that is immaterial in some situations might be material in others." *Robinson*, 894 F.3d at 830.

Stieglitz's retaliation claim has expanded over time. The retaliation theory in the operative complaint involved how often Stieglitz could drive the truck *after* his suspension. The fire department allowed him to drive again, but "not on a permanent basis." *See* Second Am. Cplt., at ¶ 38 of Count II (Dckt. No. 21). "The CITY's conduct of disallowing STIEGLITZ from permanently driving Truck 19 and only allowing him to drive Truck 19 on an occasional basis was done in retaliation for STIEGLITZ complaining about race discrimination." *Id.* at ¶ 39 of Count II.

So, according to the complaint, the retaliation took place post-suspension. Stieglitz included that theory in his brief. He argues that the fire department retaliated against him when they wouldn't let him drive during the week after his suspension (specifically, on June 23, 26, and 29, 2017). *See* Stieglitz's Mem., at 17 (Dckt. No. 88).

Stieglitz presented evidence that he lost the ability to drive the truck on June 23, 26, and 29, 2017.  *See* Stieglitz's Mem., at 17 (Dckt. No. 88).  A loss of driving means a loss of pay.  He couldn't get the driving bonus if he wasn't driving.

In all likelihood, the loss wasn't enormous.  The City presented evidence that the driver differential pay was only $2.18 per hour in 2017.  *See* Def.'s Statement of Facts, at ¶ 9 (Dckt. No. 77).  His post-suspension retaliation claim involves only three days.  Assuming he would receive the differential pay for the entire 24-hour shift, the loss would be less than $160 (24 hours x 3 days x $2.18/hour = $156.96).  Stieglitz offers no contrary evidence, and no competing calculation.

In his brief, Stieglitz appears to argue that the suspension itself was a materially adverse employment action.  *See* Stieglitz Mem., at 17 (Dckt. No. 88).  That argument is an uphill battle. A suspension is not an adverse employment action unless it costs the employee something material.  *See Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1121 (7th Cir. 2009) ("Uncertainty as to whether the suspension will be upheld is not equivalent to actually serving the suspension because the plaintiff does not have to endure the same economic harm."); *see also Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 647 (7th Cir. 2005) ("Simply put, a suspension without pay that is never served does not constitute an adverse employment action."); *Ajaya v, Aramark Bus. Servs.*, 336 F.3d 520, 531 (7th Cir. 2003) ("An unfulfilled threat, which results in no material harm, is not materially adverse.").

Here, there is no evidence that the suspension cost Stieglitz anything.  Indeed, the City points out that the suspension cost Stieglitz nothing.  He did not lose his title, base salary,

26

benefits, or driver differential pay due to the suspension.  *See* City Mem., at 18 (Dckt. No. 76).[12]
He did not incur a disciplinary record, either.  *Id.*

    In response, Stieglitz comes forward with nothing.  There is no evidence in the record
that the suspension put a blemish on his disciplinary record, or hit him in the pocketbook.
There's no evidence that suspension harmed him in any way.  The suspension took place while
he was on vacation, and caused him no harm.

    The one possible exception is June 2, 2017.  Stieglitz put forward evidence that he
learned about the suspension on June 1, and that it cost him the opportunity to drive on June 2.
*See* Stieglitz Aff., at ¶¶ 59–61 (Dckt. No. 88-4).  Stieglitz offers nothing else.

    Viewed as a whole, Stieglitz appears to argue that he could not drive on four days:  June
2, 23, 26, and 29.  Stieglitz does not quantify the loss.  The only evidence in the record is that
Stieglitz received differential pay totaling $2.18 per hour.  If that's right, then the loss of an
ability to drive on four days would have cost Stieglitz a little more than $200 (24 hours x 4 days
x $2.18/hour = $209.28).

    A plaintiff must show that the adverse action was material.  *See Burlington N. & Santa
Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  "We speak of *material* adversity because we
believe it is important to separate significant from trivial harms."  *Id.* (emphasis in original); *see
also Washington v. Illinois Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005) ("Now
'material' is one of those protean words that resists further definition.").  The parties did not brief

---

[12]  As support, the City cites paragraphs 58, 60, & 61 of its Statement of Facts.  *See* City Mem., at 17–18
(Dckt. No. 76).  But those paragraphs do not establish that Stieglitz lost nothing.  They cover his vacation
from June 1 to 22, 2017, and the lifting of the suspension.  There is one statement about an email on June
23, 2017, that "nothing will be reflected in anyone's discipline file," but that's about it.  *See* Def.'s
Statement of Facts, at ¶ 60 (Dckt. No. 77).  Even so, the Court construes the motion as a *Celotex*-type
motion, meaning a motion based on the absence of proof.  That is, instead of establishing affirmatively
that Stieglitz lost nothing, the City argues that Stieglitz has no evidence that he lost anything.

whether each and every economic loss counts, or whether there is a ballpark monetary threshold. Maybe $200 counts, and maybe it doesn't – the Court does not know, because the parties did not brief it. *See Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel."); *see also Anderson v. Catholic Bishop of Chicago*, 759 F.3d 645, 650 (7th Cir. 2014). The very existence of a materiality requirement suggests that the law requires something more than "in for a penny, in for a pound."

More importantly, the City did not argue that the economic loss in question (if any) does not satisfy the materiality threshold. So, for the sake of argument (and in light of its conclusion on the issue of proximate causation, below), the Court will assume without deciding that the loss of differential pay for those four days constituted a materially adverse employment action. *See, e.g.*, *Lewis*, 496 F.3d at 653 (noting that a category of materially adverse employment actions include cases involving "the employee's current wealth such as compensation"); *Herrnreiter v. Chicago Housing Auth.*, 315 F.3d 742, 744 (7th Cir. 2002) (noting that a materially adverse action includes "[c]ases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished"); *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993) (noting that "a decrease in wage or salary" can be materially adverse; *see also Smart v. Ball St. Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) ("Adverse employment action has been defined quite broadly in this circuit.").

###    C.    Causation

The last remaining issue is proximate causation, and that's where all of the wheels fall off.

28

A plaintiff must present evidence of a connection between the protected activity and the adverse employment action. To show a causal connection, the plaintiff must show "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "[R]etaliatory motive may be established through circumstantial evidence such as suspicious timing, ambiguous statements, evidence that the stated reason for the employment decision is pretextual and 'other bits and pieces from which an inference of discriminatory intent might be drawn.'" *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 881 (7th Cir. 2014) (quoting *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 307 (7th Cir. 2012)). But a plaintiff's "uncorroborated speculation does not prevent summary judgment." *Carothers v. County of Cook*, 808 F3d 1140, 1153 (7th Cir. 2015).

Stieglitz failed to come forward with evidence that the protected activity caused the loss of driving opportunities. He rests exclusively on timing.

"Suspicious timing alone rarely establishes causation, but if there is corroborating evidence that supports an inference of causation, suspicious timing may permit a plaintiff to survive summary judgment." *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015). However, "where the adverse impact comes 'on the heels' of the protected activity," suspicious timing can be enough. *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (finding that firing someone "the very day after she complained" was enough to survive summary judgment).

The record includes no evidence supporting the notion that race discrimination caused the loss of his driving privileges on June 2, 2017. The only evidence in the record is that he could not drive because he lacked an FSVO certification. The fire department took away his ability to

drive while it conducted its investigation. There is no evidence that race played a role in that decision.

There is no evidence that he could not drive after his suspension because of his race, either. In his affidavit, Stieglitz stated that he learned about the end of the suspension on June 22, but could not drive on June 23, 26, and 29, 2017. *See* Stieglitz Aff., at ¶¶ 62–65 (Dckt. No. 88-3). Nothing about that schedule flunks the smell test.

Under Stieglitz's version of the facts, he lost the ability to drive for only a few days. It did not continue in the months that followed. And the days in question were right after the fire department lifted the suspension – not "on the heels" of his racial discrimination complaint during January and March.

Every workplace has work schedules. It is not particularly surprising that the fire department already booked someone else to drive the truck on June 23–29. For example, Capt. Clay testified that he scheduled rotations month-to-month. *See* Clay Dep., at 159:2-13 (Dckt. No. 77-6). The fact that Stieglitz couldn't hop into the driver's seat the day after his suspension does not raise an eyebrow. One would hope that the Chicago Fire Department already had a plan in place on June 22 for who would drive the firetruck on June 23.

Maybe it would be different if the fire department made an abrupt, unexpected scheduling change after lifting the suspension. That is, it would be one thing if the fire department had scheduled Stieglitz to drive on June 23, 26, and 29 – despite the suspension – and then lifted the suspension but cancelled his schedule for no reason. But there's no evidence that the fire department pulled the rug out from his schedule after lifting the suspension.

No reasonable jury could conclude that the loss of an ability to drive on only three days – immediately after the end of the suspension – was an act of retaliation. To support a finding of

retaliation, Stieglitz needed to offer more. And he simply didn't. For example, he offered no evidence of any statements by anyone suggesting that the fire department wouldn't let him drive at the end of June for bad reasons.

It is helpful to keep the chronology in mind. The protected activity took place in the first few months of 2017. Stieglitz contends that he engaged in a protected activity when he complained to the Office of the Inspector General and to the investigator for the Internal Affairs Division. According to him, he complained that Capt. Clay had engaged in reverse race discrimination when he hired black drivers.

Those conversations took place months before the fire department lifted his suspension. Stieglitz contacted the Inspector General on January 31, 2017, and spoke with the investigator on March 28, 2017. *See* Pl.'s Additional Facts, at ¶¶ 51–56 (Dckt. No. 88-2). The suspension took place in the first three weeks of June 2017, and it ended on June 22, 2017.

To make his case, Stieglitz would need to offer evidence that the fire department lifted his suspension on June 22, but then retaliated against him for complaining about race discrimination in the first three months of 2017. That is, to support his theory, Stieglitz needed to muster evidence that the fire department lifted the suspension but then retaliated against him anyway for raising the race issue months earlier. And on that score, the record is simply barren.[13]

---

[13] The record does not reveal who drove on the days in question, or how the fire department made that decision. Maybe the fire department merely continued to use a rotation system, and maybe it was too late to put Stieglitz back into the rotation. If so, that scenario would not give rise to a retaliation claim. A return to the status quo isn't retaliation. *See McDonnell v. Cisneros*, 84 F.3d 256, 258 (7th Cir. 1996) ("The complaint shows that there was no causal connection . . . . The allegedly retaliatory conduct was merely the continuation of the conduct giving rise to the complaints."). That said, the Court does not reach that issue here because the record does not reveal how the fire department decided who would drive on those particular days.

**Conclusion**

For reasons stated above, the City's motion for summary judgment is granted on both counts.

Date:   September 3, 2021

_____

Steven C. Seeger
United States District Judge