**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals
### For the Seventh Circuit
### Chicago, Illinois 60604

Argued July 7, 2022
Decided July 12, 2022

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

THOMAS L. KIRSCH II, *Circuit Judge*

No. 21-2784

| | |
|---|---|
| DAVID STIEGLITZ, *Plaintiff-Appellant*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| v. | No. 19-cv-76 |
| CITY OF CHICAGO, *Defendant-Appellee*. | Steven C. Seeger, *Judge*. |

**O R D E R**

David Stieglitz, a Chicago firefighter, sued the City of Chicago under Title VII of the Civil Rights Act of 1964 for race discrimination and retaliation. He alleged that his captain deprived him of lucrative opportunities to drive a fire truck because of his race (White) and that, after he protested, the Chicago Fire Department retaliated against him by briefly suspending him from driving. The district court granted the City's motion for summary judgment, concluding that Stieglitz lacked evidence to dispute the City's non-discriminatory reasons for scheduling multiple drivers and for the suspension. Because a jury could not reasonably infer from the evidence any intent to discriminate or retaliate, we affirm.

I

Stieglitz joined the Chicago Fire Department as a firefighter in 2005 and has driven various types of vehicles since 2008. Firefighters receive the equivalent of an additional $2.18 per hour on shifts when they are assigned as drivers. In May 2016, amid a driver shortage, Stieglitz volunteered for a temporary assignment as the third-shift driver of Truck 19 (a ladder truck) at the Chicago Avenue firehouse, home of the Department's First District, Third Battalion. Captain Steven Clay, who is Black, led that shift.

Since 2015, the Fire Department has required drivers to obtain specific training and certifications to operate its different vehicle types. Stieglitz was not certified to drive Truck 19, but he believed (accurately, as it turned out) that he was "grandfathered" under the relevant policy based on his experience driving before the 2015 policy was enacted.

Clay offered Stieglitz a permanent role as third-shift driver after his temporary assignment concluded. Stieglitz accepted and began driving Truck 19 regularly in June 2016, reporting directly to Clay. Stieglitz understood from Clay that he would be the sole driver of Truck 19 and, therefore, the sole beneficiary of the additional driver pay. But in October 2016, Clay hired two other firefighters to share driving duties with Stieglitz. Like Stieglitz, these firefighters had experience driving fire vehicles but lacked the correct certification for Truck 19 under the most recent policy. The new drivers were Black.

The parties dispute whether driver rotations are a common or even permissible practice within the Department. Clay, who had participated in driver rotations at the Department, attested that he instituted the rotation to familiarize the crew with the vehicle and neighborhood; he believed that this approach "makes more efficient and productive firefighters." He also thought that having multiple drivers assigned to a shift provides valuable flexibility in staffing.

Stieglitz saw matters differently. He was convinced that Clay's hiring of the two Black drivers reflected favoritism toward them, and against himself, on the basis of race. He accordingly filed a complaint of race discrimination with the City's Office of the Inspector General in January 2017. When interviewed that March, Stieglitz stated that he knew discrimination was at play because the new drivers drove Truck 19 despite lacking the proper certification. By then, however, the new drivers had obtained their certifications. Stieglitz also revealed that he lacked formal certification under the most recent policy.

The Inspector General referred Stieglitz's complaint to the fire department's internal-affairs division, which continued investigating. When all was said and done, the

Case: 1:19-cv-00076 Document #: 105 Filed: 08/03/22 Page 3 of 6 PageID #:1496
Case: 21-2784    Document: 00714045224    Filed: 08/03/2022    Pages: 6

No. 21-2784 Page 3

investigator opened a total of 35 files regarding the use of uncertified drivers. The investigator informed the assistant commissioner for internal affairs that Stieglitz—now the only noncertified driver on the Chicago Avenue's third shift—was driving Truck 19 without the correct certification. The assistant commissioner emailed the chief of the First District with an order that Stieglitz be temporarily suspended from driving. The district chief forwarded this order to Clay and the battalion chief, who leads the firehouse. Notably, Stieglitz does not allege that Clay or the battalion chief was involved in his suspension.

On June 1, Clay informed Stieglitz by phone that he was suspended from driving. At the firehouse the next day, the battalion chief showed him the assistant deputy commissioner's email confirming Stieglitz's suspension from driving Truck 19. The next day, Stieglitz departed on a pre-planned paid vacation. He returned to work on June 23.

During Stieglitz's vacation, the assistant commissioner determined that Stieglitz was indeed grandfathered under the new policy and therefore did not require any further certification to drive Truck 19. Clay informed Stieglitz upon his return that the suspension was rescinded, and he was back in the driving rotation. Stieglitz worked, but did not drive, on June 23, 26, and 29; he resumed driving in the rotation on July 1, 2017. In a conversation with Stieglitz in August, the battalion chief acknowledged that she was— by then—aware that Stieglitz had complained to the Inspector General about Clay's driver-rotation policy.

Stieglitz filed a charge of discrimination with the EEOC in September 2017 and received a right-to-sue notice the next month. Stieglitz also transferred away from the Chicago Avenue firehouse because of what he described as a "hostile work environment." As the only White firefighter on his shift, Stieglitz felt that he had been excluded from firehouse social events and meals because of his race and that his interactions with the new drivers had been hostile. But at no time did Stieglitz report that his coworkers made comments about race. He also does not allege that Clay or any other superiors contributed to a hostile environment.

Stieglitz sued the City of Chicago, alleging that it violated Title VII by depriving him of driving assignments because of his race and by suspending him from driving in retaliation for his complaints. Stieglitz specified seven dates on which he believes that, but for the allegedly discriminatory rotation, he would have driven Truck 19, which caused him to lose the extra compensation (just over $350 total by the City's estimation).

After discovery, the City moved for summary judgment. In its ruling, the district court first concluded that, under *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016)—a modified *McDonnell Douglas* framework used when the plaintiff is not part of a traditionally disadvantaged class—the City had presented a nondiscriminatory reason for the driver rotation: Clay's belief that rotating drivers increases firefighters'

effectiveness. The court also held that Stieglitz had failed to raise a factual dispute about whether Clay's reasons for his actions were pretextual. It found that Stieglitz had no evidence that anything but uncertainty about the significance of his lack of certification—a neutral reason—caused his suspension. Finally, the district court stepped back and considered the evidence as a whole, see *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016), and concluded that Stieglitz lacked evidence that any adverse decision was related to his race. With respect to the retaliation claim, the court assumed that the short suspension was a materially adverse action but determined that Stieglitz's timing-based argument failed to link his suspension to his earlier complaint to the Inspector General. The court entered judgment for the City.

## II

Because this case comes to us from a grant of summary judgment, we evaluate the district court's decision *de novo*, construing all facts and reasonable inferences in Stieglitz's favor. See *Formella*, 817 F.3d at 510. Although there surely are some disputes of fact in this record, none of them is material to the essential question: whether a factfinder could conclude that he was the victim of either race discrimination or retaliation.

Stieglitz first argues that the district court incorrectly applied the *McDonnell Douglas* framework to his discrimination claim and should have evaluated the evidence "as a whole" under *Ortiz*, 834 F.3d at 766. This argument goes nowhere, because the court did evaluate Stieglitz's claim under *Ortiz*, and its earlier organization of the evidence under *Formella* was sound.

No matter how Stieglitz sorts his evidence, he falls short of creating a dispute of material fact. First, under *Formella*, a plaintiff who is not part of a traditionally disadvantaged class needs evidence either of circumstances suggesting that the employer was inclined invidiously to discriminate against Whites or, failing that, of "something 'fishy' about the facts at hand." *Formella*, 817 F.3d at 511. Stieglitz asserts that using a driver rotation was sufficiently idiosyncratic to be "fishy." But even if a driver rotation is unusual (the City disputes this), Stieglitz does not explain how allowing individual fire captains to decide how to distribute driving duties allows an inference that the City is inclined to discriminate against Whites. See *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 679 (7th Cir. 2012), *overruled on other grounds by Ortiz*, 834 F.3d 760. Stieglitz's only "evidence" that Clay (the decisionmaker with respect to the driver rotation) was inclined to discriminate is that Clay is Black. Under Title VII, however, Stieglitz's race, not Clay's, is relevant. The record does not show that Clay ever mentioned race, disparaged White people, or had a history of favoritism toward non-Whites. And, just as the Supreme Court has refused to presume that "human beings of one definable group will not discriminate against other members of their group," *Castaneda v. Partida*, 430 U.S. 482, 499 (1977), we are confident that it would not presume that people of one race will

Case: 1:19-cv-00076 Document #: 105 Filed: 08/03/22 Page 5 of 6 PageID #:1498
Case: 21-2784      Document: 00714045224         Filed: 08/03/2022      Pages: 6

No. 21-2784 Page 5

necessarily discriminate against people of a different race. That, it seems to us, puts an end to this part of Stieglitz's case. We add that he did not connect Clay to the alleged overall hostility he experienced at the firehouse.

The competing drivers' race could be relevant if Stieglitz could link Clay's allegedly more favorable treatment of them to their race. See *Formella*, 817 F.3d at 511. But the only "more favorable" treatment he identifies is that "they were allowed to drive Truck 19 even though they were not certified" before February 2017. But Stieglitz also drove without holding a formal certificate at this time, and it had not yet been determined that he was excused from the requirement. The parties dispute whether Stieglitz drove *more* than the new firefighters, as the City contends, but Stieglitz has not alleged, nor does he have evidence, that he drove any *less*. He cannot show that, with respect to driving opportunities (the only action that Stieglitz contends on appeal was discrimination), he was treated less favorably than others under Clay's supervision.

Furthermore, the City came forth with a neutral explanation for the driver rotation at the Chicago Avenue firehouse. Clay explained that using a rotation was consistent with his own training and was a way to provide scheduling flexibility and make sure all firefighters learned the local geography and got driving experience. Stieglitz insists that these reasons are pretextual because Clay never told him that the rotation was implemented "to make . . . more efficient and productive firefighters." But Clay was not required to share his reasoning with his subordinate, and his decision not to do so does not demonstrate that his reason is false. *Owens v. Chicago Bd. of Educ.*, 867 F.3d 814, 815 (7th Cir. 2017). Stieglitz's inference about Clay's true motive—that he favored members of his own race—does not qualify as evidence that Clay lied. "Speculation is no substitute for evidence at the summary judgment stage." *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014).

Outside the burden-shifting framework, Stieglitz fares no better. We grant for present purposes that the slight adverse effect on his income that resulted from the need to share driving duties was an adverse employment action. Stieglitz must show, however, that if he were not White, he would have been the sole regular driver of Truck 19 during his shifts. See *Ortiz*, 834 F.3d at 765. The evidence he proffered falls well short of such a showing. Stieglitz's claim comes down to his belief that he lost chances to drive because he is not Black. But he needs more than a "personal belief[],"even if genuine, to create a factual dispute over whether he was the victim of race discrimination. *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018).

With respect to retaliation, Stieglitz contends that the Department temporarily suspended him from driving the truck (and receiving the extra compensation) because he filed a complaint with the Inspector General about the driver rotation. His burden was to present evidence that this complaint was a but-for cause of the suspension

Case: 1:19-cv-00076 Document #: 105 Filed: 08/03/22 Page 6 of 6 PageID #:1499
Case: 21-2784    Document: 00714045224    Filed: 08/03/2022    Pages: 6

No. 21-2784                                                                    Page 6

(assuming it qualifies as adverse).[1] *Id.*

Stieglitz has no evidence that his suspension was related to his complaint about perceived race discrimination in driving assignments, even taking into account the fact that the investigation into driver certifications stemmed from his report. He relies on timing, but four months passed between his complaint and his suspension. Such a lengthy gap far exceeds the "few days" from which we have inferred causation. See *Igasaki v. Illinois Dep't of Fin. & Prof'l Regul.*, 988 F.3d 948, 959 (7th Cir. 2021) (two-month gap "cannot show retaliation on its own."). Stieglitz also asserts pretext: that his lack of certification was not the real reason because the Department "clearly knew that [he] was grandfathered in and did not need a [] certification" to drive Truck 19. But he does not point to evidence in the record that the senior officials who ordered his suspension realized at the time that the certification policy exempted Stieglitz because of the length of his tenure. Perhaps those officials should have checked before ordering the suspension, but to the extent they handled the situation poorly, their error was promptly corrected. This does not suggest a retaliatory agenda.

Indeed, in order to raise a triable issue based only timing, Stieglitz needed evidence that the decisionmakers were aware of his discrimination complaint. Yet he points to nothing that would counter the City's evidence that the assistant commissioner and district chief were unaware of the complaint at the time they suspended him. See *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 578 (7th Cir. 2021). Stieglitz notes the battalion chief knew about it by August, but that was weeks after the suspension had been rescinded. The record does not, therefore, contain evidence that would permit a reasonable factfinder to conclude that the suspension was motivated by Stieglitz's January complaint. *Igasaki*, 988 F.3d at 959.

We AFFIRM the judgment of the district court.

---

[1] The City points out that the January 2017 report does not mention race, and that therefore the complaint might not be protected activity. But Stieglitz attests that he brought up racial discrimination. The City also disputes that the suspension was materially adverse, but Stieglitz (who was on a paid vacation for his entire suspension) argues that the four nonvacation days in June he was not assigned to drive were sufficiently adverse to support his retaliation claim. Nonetheless, even accepting Stieglitz's position on both these points, his claim does not survive summary judgment.